# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

DEVELOPERS DIVERSIFIED of            )
TENNESSEE, INC.,                     )
                                     )
       Plaintiff,                   )
                                     )
v.                                   )    **CASE NO. 3:04-0015**
                                     )    **JUDGE KNOWLES**
                                     )
TOKIO MARINE & FIRE INSURANCE )
CO.,                                 )
                                     )
       Defendant.                   )
_____

TOKIO MARINE & FIRE INSURANCE )
CO.,                                 )
       Counter-Plaintiff           )
                                     )
v.                                   )
                                     )
DEVELOPERS DIVERSIFIED of            )
TENNESSEE, INC.,                     )
                                     )
       Counter-Defendant.          )
_____

DEVELOPERS DIVERSIFIED of            )
TENNESSEE, INC.,                     )
                                     )
       Counter-Defendant and Third- )
       Party Plaintiff,            )
                                     )
v.                                   )
                                     )
CHM ROOF CONSULTANTS, INC.,          )
                                     )
       Third-Party Defendant.      )
_____

**TOKIO MARINE & FIRE INSURANCE**  )
**CO.,**  )
  )
        **Plaintiff,**  )
  )
**v.**  )
  )
**FORESIGHT SERVICES, INC., f/k/a**  )
**FORESIGHT CONSULTING, INC.**  )
  )
        **Defendant.**  )

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court upon Cross-Motions for Summary Judgment filed by Plaintiff Developers Diversified of Tennessee, Inc., (Docket No. 173) and Defendant Tokio Marine & Fire Insurance Co. (Docket No. 179) in this diversity action. Both parties have submitted supporting memoranda, Exhibits, Affidavits, and Statements of Undisputed Facts. Each party has filed a Response to the other's Motion, and each party has filed a Reply to the other's Response.

This action arises from the partial collapse of the roof of a building in Brentwood, Tennessee, owned and managed by Plaintiff and leased to Defendant's insured, The Sports Authority, Inc. (SA). Docket No. 1. Tokio paid SA approximately $2 million for damage to SA's merchandise, and it became apparent that Tokio would seek the reimbursement of this amount from Plaintiff. Rather than waiting to be sued by Tokio, Plaintiff filed a declaratory judgment action, seeking a declaration that it is not liable to Tokio. Tokio subsequently filed a counterclaim against Plaintiff, seeking to recover on a subrogation theory.

The instant Motion must be analyzed against the background of the parties' previous Motions for Summary Judgment and the Court's decision upon those Motions. Docket Nos. 26,

2

30, 45, 46.  Insofar as relevant to the instant Motions, Plaintiff previously argued that SA had expressly waived any right to pursue a claim against Plaintiff for damage to its merchandise and had expressly agreed to hold Plaintiff harmless from any such claims and, therefore, that Defendant, which stood in the shoes of its insured, had no subrogation right to assert such a claim.  Defendant filed a Cross-Motion for Summary Judgment, seeking summary judgment only "with respect to all claims and actions that have been asserted against it by the Plaintiff . . . ." (Defendant did not seek summary judgment with regard to the allegations of its counterclaim against Plaintiff.)

In its previous Motion for Summary Judgment, Plaintiff relied upon Article 28 of the original Lease, which is headed "Indemnification and Insurance" and which states in pertinent part as follows:

> During the Lease Term, Tenant shall indemnify defend (by counsel reasonably acceptable to Landlord), release and hold Landlord and Landlord's partners, agents, employees, mortgagee . . . and assignees, harmless against all penalties, claims or demands of whatsoever nature arising within the Tenant's Building, except those which shall result, in whole or in part, directly or indirectly, from the default or gross negligence of Landlord, Landlord's partners, agents, employees, assignees or Landlord's ground lessor, if any.

Plaintiff argued that, in Article 28, SA had released it from any claims except those resulting from Plaintiff's "default or gross negligence."  Plaintiff argued that that exception was inapplicable because it did not commit a "default," nor was it guilty of "gross negligence." Plaintiff argued that, since SA released it, and since the exception did not apply, Defendant, which stood in the shoes of SA, had no claim against it.  Defendant argued in part that Article 14 of the original Lease provided that Plaintiff was solely responsible for "all maintenance,

3

replacement and repair to the roof." Defendant further argued that, under Article 14, Plaintiff was required to perform all maintenance, replacement and repairs due to its own acts, omissions, neglect or negligence, and that Article 14 required that all repairs, maintenance and replacements be performed in a good workmanlike manner. Defendant argued that Plaintiff breached Article 14 by blocking the roof drain openings, which resulted in the accumulation of water on the roof, which caused the partial roof collapse and attendant damage. Defendant argued that Plaintiff's breach of Article 14 invalidated the release provision of Article 28, because the breach constituted a "default," which is an articulated exception to the release. Defendant further argued that Plaintiff's conduct in installing steel slats in front of the scupper drain openings was gross negligence.

In addressing these arguments in its Memorandum Opinion, the Court stated in part as follows:

> In order for Plaintiff to prevail on its Motion for Summary Judgment under Article 28 of the original Lease, Plaintiff would have to show that there is no genuine issue as to material fact (1) that it was not guilty of default or gross negligence, or (2) that if it was guilty of default or gross negligence, that default or gross negligence did not directly or indirectly result in the partial roof collapse that gave rise to the damage to Sports Authority's merchandise.[8] The Court concludes, however, that there is a genuine issue as to material fact concerning whether Plaintiff was guilty of default or gross negligence. There is also a genuine issue as to material fact concerning whether, if Plaintiff was guilty of default or gross negligence, that default or gross negligence directly or indirectly resulted in the partial roof collapse.
>
> Plaintiff has not shown that it was not guilty of default. A reasonable fact finder could conclude that Plaintiff's installation of the slats in front of the drain openings was a breach of the

4

provision of Article 14A that requires all repairs, maintenance and replacements performed by the Landlord to be performed in a "good, workmanlike" manner. Additionally, a reasonable fact finder could conclude that Plaintiff was guilty of negligence in installing the steel slats, that Plaintiff was responsible to perform "all maintenance, replacement and repairs" resulting from Plaintiff's own negligence, and that Plaintiff did not do so. Thus, Plaintiff cannot show that it is entitled to a judgment as a matter of law that it did not commit a default.

If Plaintiff did commit a default, it could still invoke the release provisions of Article 28 if it could show that its default did not directly or indirectly result in the partial roof collapse. As discussed above, however, there is a genuine issue as to material fact concerning what caused the roof collapse. Plaintiff, therefore, cannot make the required showing, and it is not entitled to a judgment as a matter of law that Defendant's subrogation claim is barred by Article 28 of the original Lease

To the extent that Defendant seeks a judgment that it is entitled to pursue its subrogation claim against Plaintiff despite the provisions of Article 28, that Motion must be denied as well at this time. If Plaintiff can ultimately show either that it did not commit a default or that, if it did, that default did not directly or indirectly cause the partial roof collapse, the provisions of Article 28 could apply to Defendant's subrogation claim.

.

Docket No. 45, p. 19-21 (footnote in original). Footnote 8 in the quoted material reads as

follows:

> Technically, under *Celotex*, Plaintiff would also be entitled to summary judgment if it could show that Defendant will be unable to prove an essential element of its case at trial. Thus, if Defendant will be unable to show that Plaintiff was guilty of default or gross negligence, or if Defendant will be unable to show that any default or gross negligence on the part of Plaintiff directly or indirectly resulted in the damage, Plaintiff would be entitled to summary judgment. Plaintiff, however, has not even made this argument, and it will not be discussed further herein.

*Id*., p. 19-20 n.8.

In its Order concerning the previously-filed Motions for Summary Judgment, the Court

5

stated in relevant part, "Specifically, neither party is entitled to a judgment as a matter of law with regard to their arguments concerning Articles 14 and 28 of the original Lease Agreement, the Court finding that there is a genuine issue as to material fact." Docket No. 46.

In its previous Memorandum Opinion, the Court found that certain facts were undisputed. Further discovery, however, has shown that some of those "facts" were incorrect.

Plaintiff and Sports Authority did not enter into a commercial Lease Agreement on or about January 14, 1998. (Docket No. 45, p. 8) Instead, SA entered into a commercial Lease Agreement with an entity known as Hendon Investments, Inc. Docket No, 1, Ex. A. The Lease itself stated that it was "made and entered into as of this __ day of January, 1998, . . . ." *Id*., p. 1. The blank is not filled in, but the acknowledgments with regard to the signatures on the Lease are dated January 13 and 14, 1998.

On January 15, 1998, Hendon Investments, Inc., assigned the SA Lease to Service-Hendon Cool Springs Associates, L.L.C.

On or about April 20, 2000, Plaintiff acquired from Service-Herndon the shopping center of which SA's building was a part. In connection with that acquisition, Service-Hendon assigned to Plaintiff a number of Leases, including the SA Lease. The "Assignment and Assumption of Leases" between Service-Hendon and Plaintiff states in part:

> Assignee [Plaintiff] hereby assumes and agrees to perform all of the terms, covenants, obligations and conditions of the Leases which are required to be performed or complied with by Lessor under the Leases, in respect of the period from and after the date of this Assignment.

When the Lease was executed in January 1998, SA's building had not yet been built. The Lease between SA and Hendon required Hendon to construct SA's building, in accordance

with certain approved drawings and specifications. As discussed above, pursuant to a written assignment of leases dated January 15, 1998, Hendon assigned all of its rights and obligations under the SA Lease to Service-Hendon. Service-Hendon contracted with the design firm of Pieper O'Brien Herr Architects, Ltd., to perform architectural design services for SA's Building. Service-Hendon also entered into a contract with R.J. Griffin & Co. to serve as the general contractor for SA's building.

In 1998, during the original construction of the SA location, Holland Roofing of Nashville, Inc., installed a Carlisle Syntec single-ply ballasted roof on the SA location, pursuant to a subcontract with the general contractor R.J. Griffin and pursuant to the specifications provided and prepared by design professionals. Defendant's Responses to Plaintiff's Statement of Undisputed Facts (Docket No. 195), ¶ 20. Holland Roofing's standard construction practice at the time of the construction of the SA roof was to install Carlisle perforated ballast retaining bars in front of scupper openings on Carlisle roofs. *Id.*, ¶ 21. The original design and construction of the roof on the SA building called for the installation of gravel stops at the scupper openings.

Grant Stout was employed by the architect, Pieper, and was one of the original architects for the SA store. *Id.*, ¶ 24. Stout agrees that, with a single-ply ballasted roof, such as the one on SA's building, it is necessary to have protection in front of scuppers, or down-spout openings, to prevent rock or ballast or other material from blocking the down-spouts from the roof. *Id.*

On May 4 and 5, 2003, heavy rains occurred in Brentwood. In the early morning hours of May 5, part of the roof collapsed, causing water damage to SA's merchandise.

Defendant's expert, David Wright, a licensed professional engineer, states in part that

7

there were:

> critical as built conditions in and around the roof that were deviations from the design of the roof and/or the roofing system. These deficiencies include (1) scuppers were placed in wrong locations, (2) the slope and elevation of the steel framing at the south corner of the offset in the rear wall was incorrect, (3) the elevation difference between the two sets of scuppers was incorrect, (4) crickets were not constructed, (5) placement of non-complying ballast retainer strips in front of the scuppers, (6) lack of overflow provision in the down-spout header box, and (7) relocation and increased size of a rooftop unit.

Docket No. 181, ¶ 7.

Mr. Wright opines that all the above deficiencies contributed to the defective condition of the roof, and that the defective roof conditions caused ponding "and resultant collapse of the subject roof." *Id.,* ¶¶ 8, 12.

In its Motion for Summary Judgment, Developers essentially argues that it has no responsibility for any of the alleged deficiencies and that the deficiencies did not cause the roof to collapse. In its Motion for Summary Judgment, Tokio essentially argues that Developers did not fulfill its obligations under the Lease and that Plaintiff's defaults caused the roof collapse.

The key provisions of the Lease are as follows:

> 6. <u>DRAWINGS AND SPECIFICATIONS.</u>
>
> . . .
>
> F. <u>Construction of the Building and Site Improvements/Incorporation of Materials and Components from Tenant's Prototypical Store Drawings and Specifications.</u>
> Tenant's Prototypical and Store Drawings and Specifications and the Approved Site Improvement Drawings and Specifications shall constitute a part of this Lease; provided however that Landlord shall construct Tenant's Building in accordance with the Approved Drawings and Specifications (or any revisions thereto approved pursuant to the provisions of Article 6.D hereof) and shall

8

construct the Site Improvements in accordance with the Approved
Site Improvement Drawings and Specifications (or any revisions
approved pursuant to the provisions of Article 6.E hereof.)
Notwithstanding the approval by Tenant of the Approved Drawing
and Specifications or the Approved Site Improvement Drawings
and Specifications, Landlord shall incorporate all of the materials
and components specified in Tenant's Prototypical Store Drawings
and Specifications into the Approved Drawings and Specifications
and the Approved Site Improvement and Specifications and to the
extent such materials and components are not incorporated or
replaced by a substitute written approval by Tenant in its sole and
absolute discretion. . . .

. . .

## 12. LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS.

A. Representations, Warranties and Covenants.  Landlord hereby
represents, warrants and covenants as follows:

. . .

(ii) Prior to and as a condition of the Date of Delivery of
Possession, Landlord shall have substantially completed and prior
to and as a condition to the date of Date of Occupancy Landlord
shall have completed Tenant's Building in accordance with the
Approved Drawings and Specifications (and any modifications
thereto requested and approved by Tenant in accordance with
Article 6 D hereof) and shall have delivered to Tenant a final
Certificate of Occupancy for Tenant's Building and the Site
Improvements . . . .

. . .

## 14. REPAIRS AND MAINTENANCE.

A. Tenant's Building.  Tenant shall make and pay for all
maintenance, replacement and repair necessary to keep Tenant's
Building in a good state of repair and in tenantable condition
except for the items set forth in Article 17 hereof (which are
designated as Landlord's responsibility) and the following
maintenance, replacement or repair which shall remain Landlord's
sole responsibility unless Tenant, its employees, contractors,

9

agents or invitees, caused the need for such repair, in which event Tenant shall pay only its contributing factor if Landlord gives notice to Tenant of Landlord's reasonable allocation of the cost between Tenant and other parties to be named by Landlord in said notice, and Tenant reasonably agrees to such allocation. Said notice shall also include the percentage allocation to each such contributing party for each item of repair. In the event of a dispute between Landlord and Tenant with respect to said allocation, Landlord shall be entitled to pursue such remedies as are available under this Lease or at law.

(i) all maintenance, replacement and repair to the roof, slab (and floor coverings to the extent maintenance, repairs or replacements are required to the floor covering due to a slab condition), outer walls, interior walls (to the extent of structural maintenance, replacement and repair) and structural portions of the Building, the Building canopy and the loading dock area which shall be necessary to maintain the Building in a safe, dry and tenantable condition and in good order and repair and which shall be necessary to maintain the Building canopy and the loading dock area (including the structural portions of the truck wells) in good order and repair;

. . .

(iv) all maintenance, replacement and repair due to the acts, omissions, neglect or negligence of Landlord, or any other owner, occupant or tenant in the Shopping Center and each of their employees, agents or contractors;

. . .

(vii) the costs of correcting defects in or inadequacies of the initial design or construction of Tenant's Building, the Site Improvements or the Common Areas or repair and replacement of any of the original materials or equipment in Tenant's Building, the Site Improvements or the Common Areas required as a result of such defects or inadequacies;

. . .

Landlord shall use reasonable and good faith efforts to stage, sequence, and perform any repair, maintenance or replacements to the Building to minimize the disruption of and interference with

10

> Tenant's business and operations and upon commencement of such
> repair, maintenance or replacement shall be continuously
> prosecuted and all repairs, maintenance and replacements to the
> Building performed by or on behalf of the Landlord shall be
> performed in a good, workmanlike and lien free manner and in
> compliance with all applicable legal and governmental and quasi-
> governmental requirements. . . .

Tokio's argument is fairly simple. Tokio argues that the Court should "apply the plain language of the written Lease." Tokio argues that the Building was not constructed in accordance with the approved drawings and specifications (in violation of Sections 6F and 12A(ii)), and that Plaintiff did not perform maintenance replacement and repair to the roof that was necessary to maintain the Building in a safe, dry and tenantable condition (in violation of Section 14A(i)). Tokio further argues that, under Section 14A(iv), Plaintiff is responsible for "all maintenance, replacement and repair due to the acts, omissions, neglect or negligence of Landlord, or any other owner, occupant or tenant in the Shopping Center and each of their employees, agents or contractors." Tokio argues that Holland Roofing, a contractor or subcontractor of the Landlord, constructed the roof with the defects discussed above. Tokio argues that Plaintiff, as Landlord, has taken responsibility for the acts, omissions, neglect or negligence of the contractors and subcontractors of the previous Landlords, Service-Hendon and/or Hendon. Furthermore, Tokio argues that, under Section 14A(vii), Plaintiff is responsible for the costs of correcting defects in or inadequacies of the initial design or construction of the Building. Tokio essentially argues that Plaintiff had an obligation to review the initial drawings and compare the roof as it was built to these drawings. Had Plaintiff done so, according to Tokio, Plaintiff would have discovered the "defects" in the construction of the Building. Finally, Tokio argues that the roof did not meet the Standard Building Code and "was not done in a

workmanlike manner." *Id.,* p. 10.

Plaintiff's argument, essentially, is that it owes no legal duty for original design or construction errors of which it had no notice. Plaintiff argues that, under Tennessee law, it is not responsible or legally liable for the negligence in the original construction of the Building, which it purchased after the Building was completed and constructed. Moreover, Plaintiff argues that there is no evidence of gross negligence or default and that there was no default, as it had no knowledge of any defective condition relating to the original architectural and engineering design or construction of the roof and Building.

Plaintiff cites a number of Tennessee cases for the general propositions that landlords are not legally liable for defective conditions at the leasehold under Tennessee law, that landlords are not liable for dangerous conditions at the leasehold, and that landlords are not insurers of the safety of leased premises. Plaintiff also argues that, even if there is an exception to these general rules where a landlord has contracted to make repairs, it must be shown that the landlord had notice of the conditions evidencing the need to make repairs. Plaintiff argues that it is undisputed that it had no knowledge that the roof required repair in general or that the original design and/or construction were defective and required remediation. Plaintiff argues:

> In support of its claim, Tokio relies on Paragraph 14 of the Lease Agreement and suggests it creates a direct contractual duty to correct any defects in design or construction. Tokio is mistaken. Paragraph 14 of the Lease Agreement imposes upon Developers a duty to maintain the roof in good order and in a tenantable condition. Paragraph 14 does not render Developers a guarantor of the work of the architect and general contractor hired by someone else, for a period of time prior to the purchase of the property by [Plaintiff]. The purchase documents clearly establish that at the time of the purchase in April 2000, the Building was completed constructed [*sic*] and [Plaintiff's] obligations ran from the date of purchase forward. . . . The purchase documents establish that the

12

> assignee's [Plaintiff's], obligations are limited to the period "from and after the date of this Assignment." . . . [Plaintiff] has and had no obligation as to design and construction that occurred prior to its purchase of the property. There is no obligation under Tennessee law for the purchaser or property to examine the original design and construction, which were carried out by design professionals with the Tenant, to determine structural defects.

Docket No. 178, p. 14.

Plaintiff has correctly stated certain general propositions of Tennessee law with regard to a landlord's liability for dangerous conditions on leased premises. As Tokio correctly argues, however, the general principles relied upon by Plaintiff are tort principles. Tokio's position, both in its Response and in its own Motion for Summary Judgment, is based upon contract principles, not tort principles.[1]

Virtually all the Tennessee cases cited by Plaintiff involve tort claims by a tenant or a third-party against a landlord in the context of a residential lease. Plaintiff has cited one case that involves a breach of lease claim in a commercial setting, *Marshalls of Nashville, Tennessee, Inc. v. Harding Mall Associates, LTD.,* 799 S.W.2d 239 (Tenn. Ct. App. 1990).

In *Marshalls*, Plaintiff leased premises from Defendant in the Harding Mall Shopping Center in Nashville. Plaintiff began to experience roof leaks almost immediately after it became Defendant's tenant. These leaks continued over a two-year period. Defendant undertook to repair the roof in certain areas from time to time.

Plaintiff initially sued Defendant, contending that Defendant had breached the "quiet

---

[1] As discussed above, Article 28 would relieve Plaintiff of liability in the absence of default or gross negligence. Tokio has conceded that it makes no argument that Plaintiff was guilty of gross negligence. Docket No. 215, p. 21. Tokio's sole argument is that Plaintiff committed defaults under the Lease.

13

enjoyment" provision of the lease by failing to keep the roof in good repair as required by the lease. The parties entered into a mutual release agreement, which provided that they released each other from any and all claims, liabilities, and causes of action alleged by either party in the action filed by Plaintiff. As part of the settlement, Defendant agreed to replace the roof. Defendant chose a roofing contractor, which was approved by Plaintiff. The replacement of the roof began on or about June 23, 1986. That same night, a rainstorm described by the Court as being "of some proportions" occurred, resulting in water entering the store through the portion of the roof that was being repaired.

Plaintiff then filed a Second Supplemental Complaint in January 1987 for damages sustained as a result of the June 23 incident. Plaintiff again raised claims that Defendant had breached the repairs and quiet enjoyment provisions of the lease. Plaintiff also alleged that Defendant had made negligent misrepresentations with regard to the roofing contractor, that Defendant was negligent in selecting an incompetent contractor, and that Defendant was vicariously liable on the theory that the work to be performed by the roofing contractor was inherently dangerous.

In March 1987, the parties entered a second mutual release agreement. That agreement, however, specifically provided that the causes of action asserted by Plaintiff in its Second Supplemental Complaint were not affected by the release. These claims were tried before the Davidson County Chancery Court, and the Chancellor ruled in favor of Defendant. The Chancellor essentially concluded that, while the lease governed the relationship between the parties, the repair work being done by the roofing contractor was not being done pursuant to the lease, but pursuant to the mutual release agreement. The Chancellor held that the parties had

14

settled the action by substituting a "new agreement" for the lease. The Chancellor specifically held that the mutual release agreement had released the landlord from liability under the lease, and that the mutual release agreement was "the contract that governs this matter, not the lease." The Chancellor further found that Defendant had not been negligent in selecting the roofing contractor nor had Defendant made any misrepresentations regarding the roofing contractor.

On appeal, the Court of Appeals first ruled that Defendant was not guilty of negligence or misrepresentation with regard to the hiring of the roofing contractor. The Court also held that Defendant could not be held liable for the acts of the contractor upon a theory that the work was inherently or intrinsically dangerous.

The Court of Appeals next turned to the allegations that Defendant had breached the lease. The Court of Appeals disagreed with the trial court's finding that the mutual release agreement had released Defendant from liability under the lease. Thus, it was necessary for the Court of Appeals to construe the lease provisions at issue. The Court stated in part as follows:

> We respectfully disagree with the trial court's finding that the [mutual release agreement] released Defendant from any liability under the lease. However, we concur with the trial court's finding that Defendant was not in breach of the lease. Even if the trial court reaches the right result on the wrong grounds, the appellate court can affirm the trial court's judgment. . . .
>
> Prior to the [mutual release agreement's] execution, Plaintiff contended that Defendant was obligated to repair the roof because "Article IV Repairs" provided that "[l]andlord, at its own cost and expense, shall . . . keep in good order and repair . . . the roof." On the other hand, Defendant contended that Plaintiff was responsible for the leaks in the roof because of its negligent installation of two roof-top air conditioning units. The [mutual release agreement] merely settled the dispute between the parties as to who was liable for the roof repairs, providing, among other things, that the cost of repairing the roof would be shared by Defendant and Plaintiff in a sixty/forty ratio. It did not modify, supercede, or abrogate the

15

lease provisions.

> In contending that Defendant breached the "Repairs" provision of its lease with Plaintiff, Plaintiff relies on the specific language to the effect that "[l]andlord, at its own cost and expense, shall . . . *keep in good order* and repair . . . the roof." [emphasis ours]. We find this contention to be without merit. <u>A breach of a lease provision such as this is committed only after a tenant notifies its landlord that a portion of the leased premises is in need of repair, and the landlord timely fails to respond and bring about such repairs</u>. This is not the factual situation before us.

799 S.W.2d at 244-45 (italics in original, underlining added).

The *Marshalls* Court construed the "Repairs" provision of the lease to implicitly require notice as a condition precedent. While the *Marshalls* Court cited no authority for this proposition, numerous cases from other jurisdictions are in accord with this principle, and one noted authority has stated:

> It is a general rule that where possession of leased property passes to the lessee under a lease containing a covenant by the lessor to repair the leased premises, the latter cannot be held liable for a breach of this covenant without showing notice to or knowledge by him of the need for repairs; such notice or knowledge is an essential element of liability.

Annot., <u>Necessity of Notice to Landlord as Condition of Asserting Breach of Express Covenant to Repair</u>, 28 ALR 1525 (citing cases).

Furthermore, the holding of the *Marshalls* Court also allows a Landlord a reasonable period of time after receiving notice in which to effect the necessary repairs.

Tokio attempts to distinguish *Marshalls* on several grounds, none of which is convincing. Tokio argues that the Lease in the case at bar provides that the landlord shall have sole responsibility for all maintenance, replacement and repair to the roof, whereas the lease in *Marshalls* required only that the landlord, at its own cost and expense, keep the roof in good

16

order and repair. The language in the *Marshall's* Lease requiring the Landlord to keep the roof in good order appears to be essentially the equivalent of a requirement that the Landlord "maintain" the roof. Both Leases specifically use the term "repair." Thus, the only difference is that the instant Lease required Developers to "replace" the roof, whereas the Lease in *Marshalls* did not require the Landlord to replace the roof. Despite Tokio's arguments, the Court sees no reason why notice would be a condition precedent to the operation of a covenant to maintain and/or to repair, but not a condition precedent to the operation of a covenant to maintain, replace, and/or to repair.

Tokio further argues that, under Williston on Contracts, notice is not required if the landlord has the right to enter the property, or where the landlord covenants to repair before the beginning of the tenancy. *Marshalls*, however, does not recognize these propositions. If these factors had been relevant, however, surely the *Marshalls* Court would have discussed them.

Alternatively, Tokio argues that if the Court disagrees with its arguments and "chooses to impute a notice requirement, Developer's assumed responsibility to provide safe, dry, and tenable premises effectively operated to place Developers on <u>constructive</u> notice of the roof's defects such that – even if *Marshall's* [*sic*] governs here – Developers had notice." Docket No. 194, p. 15 (underlining added). Importantly, Tokio does not argue that Developers had actual notice of any roof conditions that needed maintenance, replacement, or repair.[2]

---

[2] It should be noted that Tokio's expert, David Wright, stated as follows in his written report: "There is evidence that the owner and his agents were notified to remove the improper ballast retainers by the architect and structural engineer prior to the collapse." Docket No. 197-2, p. 9. When asked about this alleged evidence at his deposition, Mr. Wright testified that he had "found no evidence to that regard." Docket No. 201-5, p. 15. He stated, "I have found hearsay." *Id.* Moreover, although it is somewhat unclear, it does not appear that Mr. Wright used the term "owner" to refer to Developers. *Id.*, p. 6.

17

In its Statement of Undisputed Facts, Plaintiff sought to have Defendant admit that "Developers had no role in the original construction of the Sports Authority location," and that "Developers had no role in the installation of the roof and roof components." Docket No. 195 ¶¶ 20, 21. Tokio denied both these facts, citing its Response to paragraph 27. Paragraph 27 and the Response thereto state as follows:

> 27. Prior to the roof collapse in May 2003 and prior to the purchase, Developers had no notice of any defective condition in the design or construction of the roof, the roof components, including down-spouts and down-spout openings, or scuppers. . . .

> RESPONSE: Deny. In July 1998, Developers had the leases, architectural drawings, engineering studies, plans and specifications and contracts relating to the original construction of and construction activity relating to the project . . . Developers had complete access to the project from July 1998. . . .

The response given by Tokio does not substantiate its denial of the facts that Developers had no role in the original construction of the Sports Authority location; that Developers had no role in the installation of the roof and roof components; or that Developers had no actual notice of any defective condition in the design or construction of the roof.

Thus, there is no factual dispute that Plaintiff did not have actual notice that the roof (or any part of the roof) needed to be repaired, maintained, or replaced. At most, Defendant raises a

_____

Tokio has not relied upon Mr. Wright's statement to argue that Plaintiff had actual notice of any defective roof conditions. Instead, this point was raised by Developers, who proceeded to argue that, even though Mr. Wright had made the statement, he had no evidence to support it.

Fed. R. Civ. P. 56(e)(1) provides that an affidavit submitted in connection with a Motion for Summary Judgment must "set out facts that would be admissible in evidence . . . ." Thus, even if Developers were attempting to rely upon Mr. Wright's statement, it appears that the Court could not properly consider that statement in connection with the pending Motions for Summary Judgment.

18

constructive notice argument, contending essentially that Plaintiff should have compared the original architectural drawings with the actual condition of the roof as built. The *Marshalls* Court, however, clearly required actual notice, not constructive notice.

All of Tokio's arguments essentially boil down to the proposition that Developers should have known of and corrected the deviations from the design of the roof and/or the roofing system before the roof collapsed. Tokio would impose these obligations upon Developers in spite of the facts that: (1) SA's Building was substantially completed in 1998, and SA took possession on September 24, 1988, while Developers did not acquire the property until April 2000; (2) Neither SA nor anyone else raised any complaints that the building had not been built as designed; (3) On November 3, 1998, Brentwood city authorities approved the building for occupancy confirming that it was in compliance with Code requirements; and (4) Developers regularly had the roof inspected.

In the case at bar, Plaintiff had no notice of any defective condition and no opportunity to correct any alleged deficiencies within a reasonable time period. Thus, applying the holding in *Marshalls* to the case at bar, the Court concludes that Plaintiff did not breach any of the Lease provisions argued by Tokio.

Tokio also makes an argument that the alleged defects discussed above violated the Brentwood Building Code. Apparently, Tokio contends that these alleged violations are a breach of Section 17 of the Lease which, according to Tokio, "expressly binds Developers to 'observe and comply with all municipal requirements, rules, orders and regulations.'" Docket No. 194, p. 15. Tokio apparently has simply misread paragraph 17 of the Lease, which states in full as follows:

19

17. <u>GOVERNMENTAL REGULATIONS</u>. *Tenant* shall observe and comply with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authorities affecting Tenant's Building, including the making of structural and non-structural alterations, insofar as they are due to Tenant's specific occupancy and not retail occupancy in general; provided, however, in the event such rules, orders and regulations shall either (a) require the removal of asbestos or other Toxic or Hazardous Waste or Substances not placed in Tenant's Building by Tenant, or (b) require structural or non-structural changes which are not due to the specific use of the premises by Tenant and are due to the general retail nature of the use, then and in either of such events, the same shall be complied with by Landlord at its sole cost and expense. Tenant shall have the right, however, to contest, without cost to Landlord, the validity or application of any such rule, order or regulation required to be complied with by Tenant in accordance with the foregoing, and may postpone compliance therewith so long as such contest does not subject Landlord to criminal prosecution for non-compliance therewith and further provided Tenant pays all fines, penalties and other costs (and interest thereon) imposed on Landlord as a result of such non-compliance by Tenant.

(Emphasis added.)

This provision of the Lease requires the Tenant, not the Landlord, to "observe and comply with all requirements, rules, orders and regulations that the federal, state and municipal governments. . . ." Clearly Developers did not breach this provision of the Lease.

Tokio also notes that, "As a general rule, in Tennessee a violation of the local ordinance, such as a Building Code constitutes negligence *per se*." Docket No. 194, p. 16 n.1. As Tokio has previously admitted, however, its claims against Developers are based on the contract, and not upon any tort theory, such as negligence.[3] Docket No. 194, p. 9.

_____

[3] Tokio states in part as follows:

> Developer's defense has confused the basis of this action. Its misplaced reliance on Tennessee tort law has obfuscated the fact that Tokio Marine, as subrogee, is exclusively seeking recompense

Moreover, as discussed above, Article 28 of the Lease releases Developers from its own negligence, leaving it liable only for gross negligence (which Tokio has not alleged) or default.

For the foregoing reasons, the Court concludes that there is no genuine issue as to any material fact and that Plaintiff is entitled to a judgment as a matter of law. Plaintiff has established, as a matter of law, that it did not violate the lease provisions alleged by Tokio. Pursuant to Article 28 of the Lease, Plaintiff is not liable to Defendant in the absence of default or gross negligence. Defendant has established neither. Therefore, Plaintiff's Motion for Summary Judgment (Docket No. 173) will be GRANTED, and Defendant's Motion for Summary Judgment (Docket No. 179) will be DENIED.

An appropriate Order will be entered.


_E. Clifton Knowles_
United States Magistrate Judge

---

for breach of the Lease, making this a contract action . . . Tokio Marine has not asserted a negligence claim, but instead has asserted breach of contract.

Docket No. 194, p. 9-10.

21