DEVELOPERS DIVERSIFIED OF      )
TENNESSEE, INC.,               )
                               )
    Plaintiff/Counter-Defendant,   )
                               )    No. 3:04-cv-00015
v.                             )    Magistrate Judge Frensley
                               )
THE TOKIO MARINE & FIRE        )
INSURANCE CO.,                 )
                               )
    Defendant/Counter-Plaintiff.   )

## MEMORANDUM

Pending before the Court is Plaintiff's motion for attorneys' fees and related nontaxable expenses (Docket Entry No. 411) and Defendant's motion to stay resolution of Plaintiff's motion for attorneys' fees and costs pending appeal (Docket Entry No. 417). For the reasons discussed below, the Court concludes that Plaintiff's bill of costs (Docket Entry No. 416) be granted, that Plaintiff's motion for attorneys' fees (Docket Entry No. 411) be granted in part and denied in part, and that Defendant's motion to stay resolution of Plaintiff's motion for attorneys' fees and costs pending appeal (Docket Entry No. 417) be denied as moot.

## I. INTRODUCTION

On January 8, 2004, Plaintiff, Developers Diversified of Tennessee, Inc. n/k/a DDR CORP., ("DDR"), filed this declaratory judgment action under 28 U.S.C. § 1332, the federal diversity jurisdiction statute, against Defendant, Tokio Marine & Fire Insurance Company ("Tokio"), to determine Plaintiff's liability as landlord for property damage resulting from a partial roof collapse over retail space leased by Defendant's insured, Sports Authority ("SA"). As SA's insurer, Defendant covered SA's loss of merchandise in the amount of $1,926,888, and as SA's subrogee,

Defendant sought reimbursement from Plaintiff. Plaintiff preemptively filed for declaratory relief, seeking a declaration that it was not liable to Defendant. Defendant thereafter filed a counterclaim, asserting that Plaintiff breached its lease agreement with SA and that Defendant suffered a loss of $2,056,073.

The Court[1] initially denied the parties' cross-motions for summary judgment on March 18, 2005. (Docket Entry Nos. 45 and 46; Docket Entry No. 250, at 3).[2] After further discovery, the parties again filed cross-motions for summary judgment. On May 20, 2008, the Court granted Plaintiff's motion for summary judgment and denied Defendant's motion for summary judgment. (Docket Entry Nos. 232 and 233). The Court held that actual notice and ability to cure a defect were required before liability could be imposed on Plaintiff. (Docket Entry No. 250, at 4). The Court did not reach the causation issue. *Id*. On February 7, 2011, the Sixth Circuit affirmed in part and reversed in part, and remanded. (Docket Entry No. 250). The Sixth Circuit concluded that actual notice was not required, but that liability could be imposed if Plaintiff had constructive notice of defects for which it bore responsibility under the lease. *Id*. at 18.

The parties again filed cross-motions for summary judgment that were denied by the Court, finding genuine issues of material fact as to causation. (Docket Entry Nos. 341 and 342). On January 12, 2016, the Court conducted a bench trial that concluded on January 21, 2016. (Docket Entry Nos. 370 and 371). On September 29, 2016, the Court found that Plaintiff was entitled to a declaratory judgment that it was not liable to Defendant for any damages caused by the partial roof

[1]The parties consented to have Magistrate Judge E. Clifton Knowles preside over this action. (Docket Entry No. 22). Due to the retirement of Magistrate Judge Knowles, on October 28, 2016, this civil action was assigned to the undersigned.

[2]Unless otherwise stated, citations are to the Court's ecf pagination.

collapse and that Plaintiff had no duty to pay Defendant for any subrogated damages. (Docket Entry Nos. 407 and 408). Defendant appealed. (Docket Entry No. 410). Pursuant to the terms of the lease, Plaintiff, as the prevailing party, filed its motion for attorney fees and bill of costs. (Docket Entry Nos. 411 and 416; Docket Entry No. 179-3, at 14). Thereafter, Defendant filed its motion to stay resolution of the motion for attorneys' fees and costs pending appeal. (Docket Entry No. 417).

On January 23, 2018, the Sixth Circuit affirmed the Court's Judgment (Docket Entry No. 421). The Sixth Circuit denied Defendant's petition for rehearing *en banc*, and issued its mandate on March 29, 2018. (Docket Entry No. 423). Plaintiff subsequently filed a supplemental memorandum (Docket Entry No. 429) in support of its initial motion for attorneys' fees, seeking attorneys' fees and related nontaxable expenses, following this Court's Judgment and Defendant's appeal. Defendant filed a response (Docket Entry No. 438) to Plaintiff's motion for attorneys' fees, to which Plaintiff filed a reply (Docket Entry No. 442). On October 3, 2018, the Court conducted a telephone conference. (Docket Entry No. 443). The Court declined to order any formal discovery or depositions of experts, but gave Plaintiff until November 1, 2018 to file any additional documentation or supplemental affidavits; Defendant until January 14, 2019 to respond; and Plaintiff until to January 28, 2019 to file a reply. (Docket Entry Nos. 443 and 444).

Plaintiff currently seeks attorneys' fees in the amount of $1,943,961.47 ($1,687,163.00 in initial attorneys' fees request, plus $187,903.68 to defend Defendant's second appeal, plus $68,894.79 incurred since March 2018[3]); costs in the amount of $936,014.72 ($922,784.72 in initial request for costs, plus $13,230.00 in expert costs incurred since March 2018); and a bill of costs in

---

[3]Plaintiff states March 2016, but the Court assumes Plaintiff means March 2018. (Docket Entry No. 452-1, at ¶¶ 12-13).

the amount of $24,904.80, all for a grand total of $2,904,880.99[4] in fees and costs. (Docket Entry No. 451, at 2, 13). Plaintiff also requests post-judgment interest and an upward adjustment of attorneys' fees in an amount the Court deems reasonable and appropriate. (Docket Entry No. 429, at 12, 14).

In response (Docket Entry No. 438), Defendant contends that (1) because SA sought and received Chapter 11 bankruptcy protection, Plaintiff is not entitled to any recovery against SA and therefore cannot recover from Defendant, as SA's subrogee, because Plaintiff failed to protect its rights during the bankruptcy proceeding; (2) Plaintiff's attorneys' fees are excessive; (3) Plaintiff is not entitled to an upward adjustment because this action is not so rare and exceptional as to warrant and enhancement; (4) Plaintiff's counsel's law firm of Lewis Brisbois, Bisgaard & Smith, LLP ("LBBS") maintains a conflict of interest in this matter, and therefore, an award of attorneys' fees and expenses in its favor is unjust under the circumstances; (5) invoices show that Plaintiff's counsel invoiced Sedgwick Claims Management Services, Inc., and thus, Plaintiff fails to show that it actually incurred any attorneys' fees; and (6) Plaintiff's request for costs and expenses for courier and delivery charges, costs associated with travel, legal research costs, and expert witness fees are not recoverable under 28 USC § 1920 and Plaintiff's request for copy costs is excessive.

Plaintiff filed a reply (Docket Entry No. 442) refuting Defendant's contentions. Pursuant to the Court's Order (Docket Entry No. 44), Plaintiff filed a supplemental reply (Docket Entry No. 445), contending that the attorneys' fees are reasonable, as the hours expended were not excessive and the hourly rates are reasonable; that Defendant's rationales for why the fees were unreasonable

---

[4]Plaintiff lists this total amount as $2,905,762.99. (Docket Entry No. 451, at 13).

or excessive are unsupported or incorrect; that Plaintiff is entitled to and upward adjustment of its fees; and that Plaintiff is entitled to post-judgment interest.

In its supplemental response (Docket Entry No. 447), Defendant contends that Plaintiff's attorneys' fees are unreasonable, citing excessive staffing and time entries, the disproportionality of fees to relief sought, and that the fees at the Bollinger and Lewis Brisbois law firms should be reduced by thirty-three percent to fifty-percent; Plaintiff's expert fee request is unreasonable; that Plaintiff is not entitled to an upward adjustment; and Plaintiff is not entitled to post-judgment interest. Plaintiff filed a final reply (Docket Entry No. 451), challenging Defendant's contentions.

## II. LEGAL DISCUSSION

Under the "American Rule," "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010); *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 697 (6th Cir. 2015). Tennessee law governs this diversity action. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Maryland*, 5 F.3d 982, 984 (6th Cir. 2005). Tennessee follows the "American Rule" for awarding attorney's fees. *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). "In the context of contract interpretation, Tennessee allows an exception to the American rule only when a contract *specifically* or *expressly* provides for the recovery of attorney fees." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009) (emphasis in original). Here, the express terms in the lease allow the prevailing party to recover all reasonable attorneys' fees and costs incurred in enforcing the terms of the lease, stating:

> 43. ATTORNEYS' FEES AND COSTS. In any action or proceedings between Landlord and Tenant arising from or relating to the interpretation or enforcement of this Lease or any dispute between the parties (including without limitation, any

mediation or arbitration and all appeals) or any action is brought to enforce the terms of this Lease (including, without limitation, the indemnity obligations hereunder), the prevailing party shall be entitled to recover all reasonable costs incurred, including, without limitation, reasonable attorneys' fees.

(Docket Entry No. 179-3, at 14). Plaintiff is clearly the prevailing party.

## A. Bankruptcy of SA

Defendant contends that because SA sought and received Chapter 11 bankruptcy protection, Plaintiff was required "to either pursue its claim against [SA] in the Bankruptcy Court or seek relief from the Bankruptcy Court to pursue the present claim outside bankruptcy." (Docket Entry No. 438, at 3). Thus, Defendant contends that because Defendant "stands in SA's shoes" and Plaintiff failed to protect its rights in the bankruptcy court, Plaintiff is precluded from pursuing its attorneys' fee claim in this action. *Id*. at 3-4.

"'Subrogation is an equitable doctrine that facilitates the adjustment of rights to avoid unjust enrichment in many types of situations by substituting one person or entity in place of another in regard to some claim or right that the second person or entity may have against a third party.'" *In re Cupp*, 383 B.R. 84, 88 (Bankr. E.D. Tenn. 2008) (citation omitted). Upon an entity filing for Chapter 11 Bankruptcy, an automatic stay is imposed which "'prohibits any act of creditors to collect a prepetition debt without court permission.'" *Collins v. Tennessee Dep't of Revenue*, 555 B.R. 670, 677 (W.D. Tenn. 2016) (citation omitted); 11 U.S.C. § 362. Motions for relief from the automatic stay are filed pursuant to 11 U.S.C. § 362(d), which provides that "after notice and a hearing, 'the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--for cause, including the lack of

adequate protection of an interest in property of such party in interest [.]'" *In re Benchmark Capital, Inc.*, 490 B.R. 566, 570 (Bankr. E.D. Tenn. 2013) (quoting 11 U.S.C. § 362(d)(1)).

Defendant does not cite any legal authority in support of its contention. SA has never been a party to this action, and Plaintiff has never sought anything from SA. Plaintiff filed this declaratory judgment action against Defendant, in which the Court ruled in Plaintiff's favor and against Defendant on its counterclaim, thereby making Plaintiff the prevailing party in this action between these two parties. Plaintiff's claim for attorneys' fees is now and always has been solely against Defendant. Defendant did not file for bankruptcy. Whether SA filed for bankruptcy is immaterial to Plaintiff's claim for attorneys' fees against Defendant. This contention is meritless.

### B. Conflict of Interest

Defendant contends that the law firm of Lewis Brisbois, Bisgaard & Smith, LLP ("LBBS") maintains a conflict of interest under Rule 1.7(a) of the Tennessee Rules of Professional Conduct, and as a result, an award of attorneys' fees and expenses in its favor would be unjust. Defendant asserts that because of this conflict of interest the Court should disregard the affidavits of LBBS attorneys (Docket Entry Nos. 412, 413, and 428) filed in support of Plaintiff's motion for attorneys' fees and therefore deny the motion for attorneys' fees as unsupported. Defendant does not cite any legal authority in support. In response (Docket Entry No. 442), Plaintiff contends that Defendant has not asserted this argument in a properly filed motion to disqualify; that motions to disqualify are disfavored; that Defendant has not shown prejudice; that Defendant waived any objection; and that even if LBBS were disqualified, the claim for attorneys' fees should not be dismissed as part of the disqualification. Plaintiff also asserts that Defendant's argument is now moot because LBBS no longer represents Plaintiff in connection with this litigation as Plaintiff's lead counsel, Bryan G.

Schumann, as of January, 2019, switched his practice from LBBS to Strauss Malk & Feder LLP, and recently substituted in for LBBS as Plaintiff's counsel. (Docket Entry No. 451, at 2; Docket Entry No. 446; Docket Entry No. 450).

Without properly filing a motion, Defendant is essentially seeking to disqualify counsel. "Although a district court possesses inherent authority to disqualify an attorney to aid the fair administration of justice, it is not to use this remedy lightly; that is, courts must remain sensitive to the parties' choice of counsel and weigh that interest against the public's interest in fair judicial process." *Barker v. Prof'l Educators of Tennessee*, No. 3:12-CV-0044, 2012 WL 1900920, at *3 (M.D. Tenn. May 23, 2012). "Whether to disqualify an attorney turns on the peculiar factual situation of the case." *Eon Streams, Inc. v. Clear Channel Commc'ns, Inc.*, No. 3:05-CV-578, 2007 WL 954181, at *3 (E.D. Tenn. Mar. 27, 2007). "A court must view a motion for disqualification with extreme caution because it can easily be misused as a harassment technique." *Am.'s Collectibles Network, Inc. v. Sterling Commerce (Am.) Inc.*, No. 3:09-CV-143-TRM-HBG, 2017 WL 2598491, at *3 (E.D. Tenn. Feb. 8, 2017). "'Motions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *McCool v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO*, No. 13-13614, 2014 WL 635797, at *3 (E.D. Mich. Feb. 18, 2014) (citing *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *subsequently aff'd*, 5 F. App'x 396 (6th Cir. 2001)). "The decision of whether to disqualify counsel is a matter of discretion." *Hosse v. Sumner Cty. Bd. of Educ.*, No. 3:13-00520, 2015 WL 1505838, at *6 (M.D. Tenn. Apr. 1, 2015) (citing *Grain v. Trinity Health*, 431 F. App'x 434, 447 (6th Cir.2011)). "The moving party 'has the burden of proving that opposing counsel should be disqualified.'" *Melville Capital, LLC*

*v. Tennessee Commerce Bank*, No. 3:11-CV-00888, 2011 WL 6888526, at *1 (M.D. Tenn. Dec. 29, 2011) (citation omitted).

This District has adopted the current Tennessee Rules of Professional Conduct as the standard of professional conduct of the members of the bar of this Court. Local Rule 83.01(c)(4). The standard for establishing disqualification of an attorney on the basis of a conflict of interest is governed be Rule 1.7 of the Tennessee Rules of Professional Conduct. Rule 1.7 provides, in relevant part, as follows:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
>> (1) the representation of one client will be directly adverse to another client; or
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>> (2) the representation is not prohibited by law;
>> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>> (4) each affected client gives informed consent, confirmed in writing.

Tenn. Sup. Ct. R. 8, RPC 1.7(a), (b). Rule 1.10 imputes the conflict of interest to an attorney's law firm, stating that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so[.]" *Id*., 1.10(a).

Defendant cites the affidavit of John Puttock, "General Counsel and Director," who is an attorney employed by Defendant. (Docket Entry No. 438-1, at ¶¶ 1-2). According to Puttock, Defendant submitted this matter to him to handle after Plaintiff filed its supplemental motion for attorneys' fees (Docket Entry No. 429), and that upon reviewing the motion and supporting documents, he discovered that LBBS performs legal work for Defendant and its insureds and that LBBS has handled at least twenty-nine (29) cases for Defendant since Plaintiff filed this action against Defendant. (Docket Entry No. 438-1, at ¶¶ 5-6). Puttock attests that Defendant had paid LBBS approximately $500,000.00 in 2017 with an additional $126,711.11 outstanding, as of July 2018, and that LBBS has performed legal services on behalf the company and its insureds since 1996. *Id*. at ¶¶ 7-8. Puttock further attests that LBBS did not notify Defendant of a conflict of interest or seek a waiver of this conflict. *Id*. at ¶¶ 9, 11.

Defendant asserts that by extensively representing Defendant and its insureds over the years, LBBS has knowledge of Defendant's litigation strategies, negotiation strategies, practices, and policies that comprise privileged information that could be used adversely to Defendant's interests in matters such as this. (Docket Entry No. 438, at 9). Defendant argues that because "[Plaintiff] prospectively filed this lawsuit against [Defendant] directly, not against its insured," "[t]his is not a situation where the identity of the insurer and the clear source of a client conflict was somehow hidden or unknown," as "[Plaintiff] and its attorneys knew of [Defendant's] involvement and elected to prosecute the original action directly against [Defendant]." *Id*. Contrary to Defendant's assertion, LBBS was not involved in this action at the time the original complaint was filed against Defendant. Bryan G. Schumann, Plaintiff's lead counsel since the inception of this action, was a partner at Bollinger Ruberry & Garvey ("BRG") when Plaintiff filed suit in January 2004, five years before

Schumann joined LBBS in 2009. (Docket Entry No. 412, at ¶ 3; Docket Entry No. 428, at ¶ 3). Thus, no conflict under 1.7 could have existed at the time Plaintiff filed suit against Defendant.

As of January 2019, Schumann joined the law firm of Strauss Malk & Feder LLP, LBBS was withdrawn as counsel from the record, and Schumann of the firm Strauss Malk & Feder LLP was substituted as lead counsel of record. (Docket Entry Nos. 446, 450 and 452-1, at ¶ 1). "However, 'courts universally hold that a law firm will not be allowed to drop a client in order to resolve a direct conflict of interest, thereby turning a present client into a former client,'" which "is commonly referred to as the 'hot potato' doctrine or rule." *Garland v. Ford Motor Co.*, No. 2:12-00121, 2015 WL 1401030, at *6 (M.D. Tenn. Mar. 26, 2015) (citations omitted); *see Santacroce v. Neff*, 134 F. Supp.2d 366, 367 (D.N.J.2001) ("The 'Hot Potato Doctrine' has evolved to prevent attorneys from dropping one client like a 'hot potato' to avoid a conflict with another, more remunerative client."). Thus, while LBBS no longer represents Plaintiff, "'the status of the attorney/client relationship is assessed at the time the conflict arises[.]'" *Id*. (citations omitted).

Plaintiff asserts that Defendant waived any objection, as LBBS acted as Plaintiff's lead counsel since 2009, but Defendant did not raise the issue of a conflict until July 2018. However, Defendant submitted an affidavit wherein Puttock attests that it was not discovered that LBBS had performed and was currently performing legal work for Defendant until reviewing Plaintiff's supplemental motion for attorneys' fees, which was filed April 30, 2018. Puttock also states that LBBS did not notify Defendant of a conflict. Nor was a waiver confirmed in writing.

In any event, Defendant does not argue or attempt to make any showing that it would suffer any prejudice if LBBS attorneys were to remain as Plaintiff's counsel, especially at this late juncture after Plaintiff is seeking to recover its significant fees and costs that it has already incurred. Nor does

Defendant provide any evidence as to what type of representation LBBS provided Defendant and its insureds. As an insurance company, "[t]he employment of an attorney . . . to represent its insured does not impose upon that attorney any duty or loyalty to the insurance company that could impair the attorney-client relationship between the attorney and the insured." *Tyson v. Equity Title & Escrow Co. of Memphis, LLC*, 282 F. Supp. 2d 829, 832 (W.D. Tenn. 2003). "Typically, the relationship between an insurance company and the attorney that it hires to defend an insured is that of principal and independent contractor." *Id.* at 231-32 (citing *Givens v. Mullikin ex rel McElwaney*, 75 S.W.3d 383, 393 (Tenn. 2002)). "Pursuant to traditional liability insurance contracts, the insurance company typically obligates itself to hire counsel to defend lawsuits against the insured, to pay the costs of defense, and to indemnify the insured for judgments and settlements within the policy's limits." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 697 (Tenn. 2002). However, Tennessee law provides:

> The employment of an attorney by an insurer to represent the insured does not create the relationship of attorney-client between the insurer and the attorney, nor does that employment necessarily impose upon the attorney any duty or loyalty to the insurer which impairs the attorney-client relationship between the attorney and the insured or impedes the performance of legal services for the insured by the attorney. Where the employer is not also a client, a conflict will not occur unless the attorney is obligated by the terms or circumstances of employment to protect the interest of the employer even to the detriment of the insured.

*Petition of Youngblood*, 895 S.W.2d 322, 328 (Tenn. 1995).

Moreover, in *Garland v. Ford Motor Co.*, a law firm proceeded to merge with another law firm knowing that the attorneys merging in were actively suing Ford and that Ford was a client of the firm into which the attorneys were merging. 2015 WL 1401030, at *1-5. While finding a violation of Rule 1.7, the court, noting its broad discretion, concluded that disqualification was not

warranted, as there was no showing that the attorneys intended to "game the system" and because the case had been pending for over two years, discovery was completed and summary judgment motions had been denied, disqualification at that stage would pose an undue hardship. *Id*. at *8-9; *Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-CV-485, 2007 WL 2907323, at *5 (N.D. Ohio Oct. 4, 2007) ("While some courts have adopted a *per se* rule requiring disqualification of counsel based on concurrent representation, this Court is persuaded that the better approach is to examine the factual situation to determine if disqualification is necessary.").

For the reasons discussed and the authorities cited, the Court concludes that Defendant has failed to establish that opposing counsel should be disqualified or that the affidavits should be disregarded.

### C. Incurring Costs and Attorneys' Fees

Defendant asserts that the invoices provided by Plaintiff in support of the motion for attorneys' fees (Docket Entry No. 428-1) reflect that Plaintiff's counsel invoiced Sedgwick Claims Management Services, Inc., not Plaintiff. Thus, Defendant contends that Plaintiff fails to show that it actually incurred any attorney fees or expenses resulting from this litigation. (Docket Entry No. 438, at 10). Defendant again does not cite any legal authority in support. Plaintiff responds that its liability insurer, Hartford Ins. Co. ("Hartford"), paid most of the litigation costs (Plaintiff paid the first $100,000 of its litigation costs as a retention under its policy with Hartford.) pursuant to its policy. Plaintiff asserts that under its policy, Hartford is subrogated to Plaintiff's right to recover those costs and just because Plaintiff obtained liability insurance to defend itself does not entitle Defendant to limit Plaintiff's recovery. (Docket Entry No. 442, at 8).

The lease provides that "the prevailing party shall be entitled to recover all reasonable costs incurred, including, without limitation, reasonable attorneys' fees." (Docket Entry No. 179-3, at 14). The term "incurred" has been defined by Tennessee courts to mean "'to become liable for' or 'to be legally obligated to pay.'" *Ernest v. USAA Cas. Ins. Co.*, No. 3:08-CV-72, 2009 WL 803106, at *3 (E.D. Tenn. Mar. 25, 2009) (citing *Terminix Int'l Co. Ltd. P'ship v. Tenn. Ins. Guar. Assoc.*, 845 S.W.2d 772, 776-77 (Tenn. Ct. App.1992) and *Hermitage Health & Life Ins. Co. v. Cagle*, 57 Tenn. App. 507, 420 S.W.2d 591, 593 (Tenn. Ct. App.1967)). In *RCK Joint Venture v. Garrison Cove Homeowners Ass'n*, No. M2013-00630-COA-R3CV, 2014 WL 1632147 (Tenn. Ct. App. Apr. 22, 2014), the issue was whether two property owners ("the Pattons") in a subdivision were entitled to an award of attorney fees for prevailing in a third-party action brought against them by the homeowners association to enforce restrictive covenants. *Id.* at *1. The association also asserted a claim against RCK, a joint venture comprised of a construction company and two limited liability companies, for inducing the Pattons to breach their contract with the Association. *Id.* at *1. The restrictive covenants included a provision for the payment of attorney fees to the prevailing party in any action brought for the enforcement of the covenants. *Id.* at *2. That provision provided that "the prevailing party shall be entitled to an award of attorney fees as additional damages." *Id.*

As a prevailing party, the Pattons sought attorney's fees incurred in the action. *Id.* at *3. The association argued, among other things, that the Pattons were not entitled to attorney fees because they did not personally pay their own attorney fees. *Id.* at *1. According to the Pattons' agreement with RCK, any attorney fees they incurred would be paid by RCK. *Id.* at *3. Thus, the Association argued that any attorney fees awarded would not inure to the benefit of the Pattons, but rather to RCK, which was not a party to the covenants that included the attorney fee provision. *Id.* The

Association argued that "an award of attorney fees to the Pattons would amount to either an inequitable windfall for them or, if the Pattons indemnified RCK, an improper circumvention of the American Rule by allowing attorney fees to be awarded to a party that was otherwise ineligible to collect such fees." *Id*. at *7. However, the Tennessee Court of Appeals noted that the attorney fee provision did not include any such language or limitation. *Id*.

In reaching a decision, the Tennessee court examined two cases, *Rogers v. Vulcan Manufacturing Co.*, 93 So.3d 1058 (Fl. App. 2012) and *Weichert Co. of Maryland, Inc. v. Faust*, 419 Md. 306, 19 A.3d 393, 408 (Md. 2011). The Tennessee Court of Appeals stated:

> In [*Rogers*], an employee of the Vulcan Manufacturing Company left his job to work for Thermodyne. Vulcan then filed an action against the employee to enforce the non-compete agreement. Thermodyne agreed to pay all the attorney fees the employee incurred defending the action. Vulcan's action was ultimately dismissed for lack of prosecution, and the employee filed a motion for attorney fees under the agreement. The trial court ruled that because the employee did not pay his own fees, he was not entitled to payment under the contractual fee provision.
>
> The appeals court reversed, reasoning that "the clear intent of this provision is that the loser pays and the winner does not," and that the actual source of the funds was irrelevant. *Rogers v. Vulcan Manufacturing Co.*, 93 So.3d at 1060. . . .
>
> *Weichert Co. of Maryland, Inc. v. Faust*, 419 Md. 306, 19 A.3d 393, 408 (Md. 2011) involved an attorney fee provision that was part of a non-solicitation clause in an employment agreement. After the defendant real estate office manager left her job to take a position with another company, her former employer brought suit, alleging that she had breached her contract by soliciting its customers. A jury found that the manager did not violate the non-solicitation clause and she filed a motion for attorney fees, which the trial court granted.
>
> The former employer appealed, arguing that its former manager was not entitled to attorney fees because she did not personally incur them, since those fees were paid by her new employer. The Maryland Supreme Court held that in the absence of restrictive language in the contract obligating the prevailing party to personally pay her own attorney's fees, the non-prevailing party was obligated to pay the fees incurred on behalf of the prevailing party, even when those fees were paid by someone else.

*Id*. at \*7-8 (citation omitted). Believing that the same principle applied and agreeing with the reasoning in these two cases, the Tennessee Court of Appeals concluded that the Pattons were entitled to an award of attorney fees pursuant to the language in the restrictive covenant. *Id*. at \*8.

It is uncontroverted that attorneys' fees were incurred. To deny Plaintiff's attorneys' fees as provided in the lease would violate the clear language in that provision and would bestow a windfall upon Defendant. Based upon the authority cited above, the Court finds Defendant's argument to be without merit.

### D. Calculation of Attorneys' Fees

Plaintiff seeks attorneys' fees in the amount of $1,943,961.47 and nontaxable expenses in the amount of $936,014.72. In its initial response, Defendant asserted that Plaintiff's attorneys' fees were excessive, evidencing occasional instances of block billing, as well as redacted billing entries that omit the explanation of work performed, overstaffing, excessive time and duplicative efforts. (Docket Entry No. 438, at 5-6). Defendant cites (1) instances where billing activity descriptions were redacted to which Defendant was unable to determine the reasonableness and necessity of that entry; (2) instances where more than one attorney billed for the same or substantially similar activities; and (3) instances of excessive or unproductive time. *Id*. at 6. In its supplemental response (Docket Entry No. 447), Defendant further asserts that (1) Plaintiff's fee request should be reduced by 40% across the board, citing excessive staffing and time entries and fees not being proportional to the relief sought; (2) Plaintiff's expert fee request is unreasonable; (3) Plaintiff is not entitled to an upward adjustment; and (4) Plaintiff is not entitled to post-judgment interest.

"In diversity cases, attorneys' fees are governed by state law." *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011). The Tennessee Supreme Court has held that the appropriate factors to be considered in determining a reasonable attorney's fee include the following:

1. The time devoted to performing the legal service.
2. The time limitations imposed by the circumstances.
3. The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.
4. The fee customarily charged in the locality for similar legal services.
5. The amount involved and the results obtained.
6. The experience, reputation, and ability of the lawyer performing the legal service.

*Connors v. Connors*, 594 S.W.2d 672, 676 (Tenn. 1980); *Hometown Folks*, 643 F.3d at 535. Courts also consider similar factors listed in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) Whether the fee is fixed or contingent;
(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) Whether the fee agreement is in writing.

Tenn. Sup.Ct. R. 8, RPC 1.5; *Keisling v. Keisling*, 196 S.W.3d 703, 729-30 (Tenn. Ct. App. 2005);

*Hometown Folks*, 643 F.3d at 535.[5]

_____

[5]Plaintiff cites that the first step in determining a reasonable fee is to calculate the "lodestar" amount. (Docket Entry No. 429, at 8). However, Tennessee courts have declined to apply a lodestar calculation and instead apply the factors set forth in *Connors* and RPC 1.5. *MAKS Inc. Gen. Trading & Contracting Co. v. Sterling Operations, Inc.*, No. 3:10-CV-443-TAV-HBG, 2014 WL 1745432,

"Tennessee has 'no fixed mathematical rule' for determining what a reasonable fee is." *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). The determination of a reasonable fee is a "'subjective judgment based on evidence and the experience of the trier of facts.'" *Id*. at 180-81 (quoting *United Med. Corp. of Tennessee v. Hohenwald Bank & Tr. Co.*, 703 S.W.2d 133, 137 (Tenn. 1986)). "'[U]ltimately the reasonableness of the fee must depend upon the particular circumstances of the individual case.'" *Id*. at 177 (citations omitted). The party requesting attorneys' fees carries the burden of establishing a prima facie claim of what a reasonable fee is. *Wilson Mgmt. Co. v. Star Distributors Co.*, 745 S.W.2d 870, 873 (Tenn. 1988). "The requesting party ordinarily carries this burden by offering an affidavit by the lawyer who performed the work." *Janoyan v. Janoyan*, No. E201301669COAR3CV, 2015 WL 274618, at *5 (Tenn. Ct. App. Jan. 21, 2015) (citing *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991)).

Plaintiff submits the affidavits and declarations of Bryan G. Schumann and D. Edward Harvey and an itemization of the time devoted and expenses incurred in prosecuting this action. (Docket Entry Nos. 412, 412-1-12, 413, 428, 452-1, and 452-3). In their affidavits, Schumann and Harvey attest that their hourly rates and the hourly rates charged for law clerks and paralegals are reasonable and are within the range of rates that are customarily charged in this community for attorneys with similar experience, skill, and qualifications. (Docket Entry Nos. 413, at ¶ 4; Docket Entry No. 428, at ¶¶ 8-10). Schumann attests that at BRG the rates charged included $190 and $225

at *10 (E.D. Tenn. Apr. 30, 2014); *United Med. Corp. of Tenn., Inc. v. Hohenwald Bank and Trust Co.*, 703 S.W.2d 133, 137 (Tenn.1986); *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 180 (Tenn. 2011) ("Relying on the lodestar calculation alone to determine a reasonable attorney's fee is problematic."); *Welcher v. Central Mut. Ins. Co.*, No. M2012-00248-WC-R3-WC, 2013 WL 1183314, at *7 (Tenn. Workers Comp. Panel Mar. 21, 2013) ("The Court declined to adopt the 'lodestar' approach and instructed trial courts to consider the factors set forth in Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a).").

per hour for senior partners' services, which briefly increased to $250 per hour; $190 per hour for associates' services; and $50.00 to $80.00 per hour for law clerks' services. (Docket Entry No. 428, at ¶ 8). LBBS's rates ranged from $190 to $200 per hour for partners and increased following Defendant's second appeal to $225 per hour; $165 per hour for associates' services; and $70 per hour for law clerk and paralegal services. *Id.* at ¶ 9. Harvey, a partner at Farris, Bobango PLC, attests that the Farris firm charged hourly rates of between $150 and $200 and devoted 704.9 hours to the prosecution of the action. (Docket Entry No. 413, at ¶¶ 4, 8). Schumann sets forth the total hours devoted in this action from November 2003 to January 2018 as 8,474.4 hours. (Docket Entry No. 428, at ¶¶ 11-12).[6] Plaintiffs also submit the declarations of L. Gino Marchetti, Jr., an attorney with extensive experience as a practicing attorney in Nashville, Tennessee, wherein Marchetti opines that the hourly rates and hours billed in this action are reasonable. (Docket Entry Nos. 445-1 and 452-2).

### 1. Reasonable Rates

Defendant does not challenge the hourly rates asserted. (Docket Entry No. 447, at 5). The Court finds the rates charged are reasonable.

### 2. Reasonable Hours

Defendant generally argues that "the fees sought are unreasonable in amount and evidence occasional instances of block billing, . . . as well as redacted billing entries omitting the explanation of work performed, overstaffing, excessive time and duplicative efforts." (Docket Entry No. 438, at 5-6). Defendant does not cite any specific examples in support of its argument. Nor does

---

[6]Plaintiff devoted an additional 80.2 hours in February 2018. (Docket Entry No. 428-1, at 77-80).

Defendant's attorneys' fees expert specifically address allegations of block or redacted billing. (Docket Entry No. 447-1, at 8-23). Defendant only states:

> As a practical matter, Tokio Marine directs the Court's attention to the following examples:
>
> (1) Multiple instances where Developers Diversified redacted billing activity descriptions without deleting the corresponding time entry for which Tokio Marine cannot determine the reasonableness and necessity of that entry; (2) Multiple instances of more than one attorney billing for the same or substantially similar activities as other attorneys in the office; (3) Multiple instances of excessive or unproductive time[.]

(Docket Entry No. 438, at 6).

Plaintiff contends that six billing entries for only 5.5 hours were redacted in order to protect privileged information and that Defendant fails to identify a single example of inappropriate block billing. (Docket Entry No. 445, at 8, 10). Plaintiff asserts based upon its affidavits it has sufficiently established that all the time expended was sufficiently described and reasonable and that the entries were made in good faith. *Id*. at 8.

As stated previously, the Court applies the factors articulated in *Connors*, 594 S.W.2d at 676 and listed in Tenn. Sup.Ct. R. 8, RPC 1.5 to determine the reasonableness of a request for attorneys' fees, and while a requesting party may carry its burden by offering affidavits by the lawyer who performed the work, "the Court can determine a reasonable fee upon consideration of all facts and circumstances presented by the record." *Hennessee*, 816 S.W.2d at 37. Here, Defendant's challenges as to block and redacted billing are unsupported by any specific examples of block billing and not addressed in Defendant's subsequent brief (Docket Entry No. 447). The redacted entries were minimal, 5.5 out of approximately 8,500. Defendant's conclusory allegations fail to show that Plaintiff's attorneys' fee request is unreasonable and should be reduced on these bases.

Next, Defendant contends that the number of hours billed should be reduced based upon excessive staffing and time entries by Plaintiff's attorneys. As an example of excessiveness, Defendant cites that, of the 8,500 hours billed by Plaintiff's attorneys, Schumann billed 5,263.7 himself, compared to Defendant's lead counsel and co-counsel, who billed a combined 4,034 total hours. (Docket Entry No. 447, at 5-6). Defendant contends that, given that Defendant and its insured incurred roughly $1,900,000 in losses, attorneys's fees plus expenses that exceed that amount by $1,000,000 is inherently excessive. *Id*. at 11-12. Defendant also asserts that it represented to Plaintiff's general counsel that this case could be settled for fifty-percent of the roughly $1,900,000 in damages, but Plaintiff chose to forego negotiations and file the declaratory judgment action. Defendant cites Plaintiff filing a third motion for summary judgment, despite the case involving a factual dispute over constructive notice and no true legal issues, and a series of motions to strike certain testimony, as examples of unnecessary and excessive work. *Id*. at 12.

Defendant also relies on the Declaration of John O'Connor, an expert on attorneys' fees. In concluding that hours billed by BRG and LBBS law firms should be reduced, O'Connor cited that with the fact-intensive nature of the case, the use of twenty-eight lawyers and staff created duplication of work and inefficiencies. (Docket Entry No. 447-1, at ¶¶ 25, 46, 47(A)-(D)). As to examples of inefficiencies and excessiveness, O'Connor opines as to the following: (1) that Schumann assigned research on basic Tennessee law and local court procedures to associates instead of seeking input from local Tennessee counsel that led to "wheel-spinning, repetition, and duplication;" (2) that Schumann spent the majority of his time from September 2011 through September 2013 working on this case and billed approximately 3,000 hours, while Defendant's lead counsel, John T. Lillis, only billed 867 hours; (3) that Vincent P. Tomkiewicz was the main assigned

attorney at BRG, but during most of the time LBBS handled the case, Tomkiewicz was underutilized and Plaintiff did not receive any benefit from his existing knowledge; (4) that the three motions for summary judgment resulted in 92.7 hours for the first motion and 300.30 for the second motion, which were reasonable, but 563 hours for the third motion with Schumann billing 355 of those 563 hours, which was excessive; and (5) that Schumann billed 395 hours for trial preparation, which was "outrageously high." *Id.* at ¶¶ 58-61, 64, 67-70. O'Connor opined that a uniform across the board reduction of between thirty-three percent and fifty-percent to the fees of the BRG and LBBS firms would be appropriate. *Id*. at ¶¶ 50-54.[7, 8]

Plaintiff contends that this action involved nearly 15 years of complex litigation relating to technical and complex issues of design, construction, maintenance and inspections of large commercial property and the length of time involved was based upon the complexity of the case combined with Defendant's changing claims, theories and litigation tactics. (Docket Entry No. 445, at 10). Plaintiff asserts that using multiple attorneys was reasonable and necessary and that many of the attorneys were billed at a lower rate, which resulted in a lower overall bill. *Id*. Plaintiff further asserts that Defendant could have avoided most of the fees incurred by Plaintiff if not for Defendant's refusals to accept Plaintiff's initial Rule 68 offer of judgment and Defendant's later refusals to settle. *Id*. at 16.

"[T]he Court can determine a reasonable fee upon consideration of all facts and circumstances presented by the record." *Hennessee*, 816 S.W.2d at 37. Here, Defendant's theories

---

[7]O'Connor opined that the hours billed by the Farris law firm were reasonable and should not be reduced. (Docket Entry No. 447-1, at ¶ 46).

[8]Defendant does not make any specific objections as to Plaintiff's hours billed defending the second appeal and fees incurred after March 2018.

changed throughout the litigation. (Docket Entry No. 407, at 5). Plaintiff originally was successful on its second motion for summary judgment. As demonstrated by the Sixth Circuit's first opinion, *Developers Diversified of Tennessee, Inc. v. Tokio Marine & Fire Ins. Co.*, 415 F. App'x 653, 654 (6th Cir. 2011), this was not a simple action as it implicated several legal and factual issues that were remanded to this Court for its determination. The Court further notes that Defendant itself filed three motions for summary judgment in this action. On remand, the Court issued a sixty-one page judgment in favor of Plaintiff on all claims. While Plaintiff's third motion for summary judgment was denied, the Court cannot say that its filing was completely unreasonable or excessive based upon this record.

As to Defendant's assertion that Plaintiff chose to forego negotiations and file the declaratory judgment action, Schuman attests that early in the litigation he made a Rule 68 offer of judgment to Defendant in the amount of $250,000, but Defendant did not respond, and that Defendant's settlement demand throughout most of the litigation was $5.5 million. (Docket Entry No. 452-1, at ¶¶ 5, 7). According to Schumann, during court-ordered meditation before trial, Defendant lowered its $5.5 million demand to $3.7 million. *Id*. at ¶ 9. Lillis attests that Defendant's $5.5 million demand may have been discussed at some point during mediation or as a separate conversation to begin negotiations and that Plaintiff made an offer of $250,000 in December 2007. (Docket Entry No. 447-1, at 6, at ¶ 14). Given that Plaintiff prevailed on its claim in all respects and Defendant recovered zero despite Defendant's demand of $3.7 million, the Court is hard pressed to understand this argument by Defendant. Further, Plaintiff was successful on its second motion for summary judgment. Plaintiff could not have known how much this action would eventually cost to litigate.

Defendant's contention as to Plaintiff's motions to strike various testimony of Defendant's experts is equally unavailing, as Plaintiff's position was validated by the Court's judgment. For instance, in its Findings of Fact and Conclusions of Law, the Court found Defendant's expert witness, Bruce Reed, was "completely unhelpful to any issues before the Court." (Docket Entry No. 407, at 43). Another of Defendant's experts, Eric Cason, could not remember when he graduated high school, had done no analysis as to what caused the roof to collapse; he was not an engineer; he was not an architect; he did not design drainage systems; and he did not do calculations regarding drainage. *Id*. at 28. The Court also found that expert David Wright testified contrarily to previous deposition testimony and changed his theory several times during the course of the case. *Id*. at 59. The Sixth Circuit also noted Wright's shifting opinions. (Docket Entry No. 421, at 14).

Next, Defendant does not cite anything to support the assertion that Plaintiff's attorneys' hours should approximate those of Defendant's attorneys' hours. Again, the Court looks at the *Connors* factors and those in TRPC 1.5. Here, Plaintiff was highly successful, given that Defendant was demanding $5.5 million and recovered zero. Plaintiff was also successful on its second motion for summary judgment. This action involved the taking of over 30 depositions. The bench trial lasted seven days. As was shown at trial, Defendant's experts were completely unhelpful and caused Plaintiff to incur increased litigation costs. Plaintiff cites Schumann's declaration where he states that Defendant's main expert, David Wright, wrote three separate expert reports; "withdrew" his prior report's conclusions; was deposed four times because of his shifting positions; and after his last deposition, less than a week before trial, testified at trial that he was purportedly still working on his analysis up to the day before trial. (Docket Entry No. 452-1, at ¶ 10). Moreover, in his declaration, Lillis does not give a full accounting of his co-counsel's hours, stating that the hours are an estimate.

(Docket Entry No. 447-1, at 6, at ¶ 16).  Whether Defendant's counsel spent less time in a losing battle is not in and of itself relevant here.

Lastly, Plaintiff asserts that its invoices refute Defendant's assertion that Plaintiff's counsel staffed this case with twenty-eight attorneys and law clerks and further asserts that the overwhelming bulk of the work and time devoted to this fifteen-year litigation was by only a few of those attorneys. (Docket Entry No. 451, at 9).  According to the invoices and both of Schumann's affidavits (Docket Entry No. 412, at ¶ 15; Docket Entry No. 428, at ¶ 17), at least twenty-six people, including Schumann, worked on this litigation from 2003 to March 2018.  Excluding Schumann and Tomkiewicz, these individuals billed approximately 1,822 hours, or roughly one-fifth of the total hours claimed.  The Court finds that these hours spent over the course of this long litigation by multiple attorneys is not in and of itself unreasonable.  The Court also notes that O'Connor does not specifically point to any specific brief, motion or task to support his conclusion that Plaintiff generally should have taken less time.  Nor does O'Connor cite to any specific examples of overbilling in the invoices.

However, although the litigation progressed for thirteen years until the Court's Judgment on September 29, 2016, based upon the Court's experience, the Court finds that over 8,500 hours billed is a bit excessive.  The Court has considered the affidavits of O'Connor and Marchetti and viewed Plaintiff's invoices.   In complicated cases involving many lawyers and lasting many years, there arises certain duplication of effort and inefficiencies for which the Court must account.  Based upon the Court's experience and the record, the Court believes that Plaintiff's fees should be reduced.  As the final fee amount requested is based upon attorneys who billed at different hourly rates and because of the voluminous entries, the Court will reduced the fee amount requested by

10%. *Daugherty v. Doyle*, No. M2013-02509-COA-R3CV, 2014 WL 6453770, at *16 (Tenn. Ct. App. Nov. 17, 2014) (affirming trial court reducing fees by 20% based upon duplication of effort and where instances when time spent by both counsel could have been less extensive in the exercise of discretion and/or billing judgment). Thus, based upon the foregoing, Plaintiff's initial fee request in the amount of $1,687,163.00 will be reduced by $168,716.30 for an award of $1,518,446.70.

Accordingly, the Court will grant Plaintiff's fee request in the amount of $1,775,245.17 ($1,518,446.70 + $187,903.68 + $68,894.79 = $1,775,245.17).

### 3. Upward Adjustment

Plaintiff seeks an upward adjustment of its fees, relying on the twelve factors set forth in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). However, Plaintiff does not cite to any authority under Tennessee law in support of a fee enhancement.[9] The Court has

---

[9]Plaintiff cites several cases involving 42 U.S.C. § 1988, which provides that a prevailing party in certain civil rights actions may recover "a reasonable attorney's fee as part of the costs." In determining whether attorney's fee was properly enhanced, the Supreme Court in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) looked at prior decisions concerning federal fee-shifting statutes and noted six important rules: (1) that a "'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case;" (2) that "the lodestar method yields a fee that is presumptively sufficient to achieve this objective;" (3) that although the Supreme Court has "never sustained an enhancement of a lodestar amount for performance, [the Supreme Court has] repeatedly said that enhancements may be awarded in 'rare' and 'exceptional' circumstances;" (4) that the Supreme Court has "noted that 'the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee,' and [has] held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation," noting that "the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel,'" that "the quality of an attorney's performance generally should not be used to adjust the lodestar '[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate;'" (5) that "the burden of proving that an enhancement is necessary must be borne by the fee applicant;" and (6) that "a fee applicant seeking an enhancement must produce 'specific evidence' that supports the award." *Id.* at 552-53 (citations and internal quotation marks omitted). The Supreme Court stated that "there is a 'strong presumption' that the lodestar figure is reasonable, but that presumption may be

26

considered the factors set forth in *Connors*, 594 S.W.2d at 676 and TRPC 1.5 in determining a reasonable fee award. Based upon the facts and circumstances of this case, the Court concludes that an upward adjustment is not warranted.

## E. COSTS

In its original response (Docket Entry No. 438, at 12), Defendant argued that Plaintiff's request for costs associated with courier and delivery charges, travel, legal research costs and expert witness fees were not recoverable under 28 USC § 1920. However, 28 U.S.C. § 1920 is not applicable where a court's authority to award costs, similar to attorney's fees, arises pursuant to a contract, not by statute. *Six L's Packing Co., Inc. v. James Eric Beale*, No. 3:10-CV-01132, 2014 WL 12577348, at *11 (M.D. Tenn. May 28, 2014) (where contract language at issue provided for "'all costs of collection, including attorney's fees'"); *Malin v. JP Morgan Chase Bank, N.A.*, No. 3:11-CV-554-TAV-HBG, 2014 WL 820003, at *3-4 (E.D. Tenn. Mar. 3, 2014); *Furnco, LLC v. Laneventure, Inc.*, No. 07-2333, 2011 WL 1565923, at *5 (W.D. Tenn. Apr. 25, 2011). Here, the terms of the lease allow for recovery of these costs sought by Plaintiff. Defendant does not object to these costs as being unreasonable except for the expert witness fees and copy costs.

### 1. Expert Witness Fees

---

overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id*. at 554; *Geier v. Sundquist*, 372 F.3d 784, 793 (6th Cir. 2004) ("The Supreme Court has emphasized that, although application of the *Johnson* factors is limited, upward adjustments are permissible in certain 'rare' and 'exceptional' cases.").

Defendant does not contest the amount of fees charged by William Pistrui Architectural and Michael S. Johnstone, in the amounts of $32,292.14 and $2,500.00, respectively. (Docket Entry No. 447, at 13). However, Defendant contends that Plaintiff's experts, Cardno Marshall Miller & Associates ($432,215.70) and Bill Reilly ($355,246.58), charged more than Defendant's experts, David Wright and Tom Allen ($366,755.62) and Matson Driscoll & Damico ($101,510.81), while providing less actual work, and that a significant disparity exists between the fees charged by Cardno Marshall Miller & Associates and by David Wright and Tom Allen and between the fees charged by Bill Reilly and by Matson Driscoll & Damico. *Id*. at 13-14.

As noted previously, Defendant's theories changed throughout the litigation. Plaintiff's experts were better prepared and more credible than Defendant's experts. In its Findings of Fact and Conclusions of Law, the Court noted that (1) Defendant's experts did not offer "an opinion or any other evidence as to what caused the purported 'excessive water accumulation,'" or "what caused the collapse," (Docket Entry No. 407, at 56-57, 60); (2) Defendant's expert agreed with Plaintiff's expert hydrologist, *id*. at 26-27; (3) it did not credit the testimony of Defendant's expert with regard to the roof maintenance for multiple reasons, including that he could not recall when he graduated from high school, had done no analysis as to what caused the roof to collapse, was not an engineer, was not an architect, did not design drainage systems, and did not do calculations regarding drainage, *id*. at 28-29; (4) Plaintiff's structural engineer expert was more credible than Defendant's structural engineer expert, Wright, who testified contrary to previous deposition testimony, attempted to evade questions, spoke in highly technical terms without explaining his testimony in a logical, coherent, and understandable manner, changed his theory several times during the course of this case, and changed his first report after it was pointed out that there were mathematical errors in his

calculations, *id.* at 59; and (5) the testimony of Defendant's expert, Reed, "was completely unhelpful to any issues before the Court," *id.* at 43. Thus, given how effective Plaintiff's experts were and ineffective Defendant's experts were, the considerable potential liability, the time devoted based upon the facts and circumstances of the case, and the results of the litigation, the Court concludes that Plaintiff's expert witness fees were reasonably incurred.

## 2. Copy Costs

As to the costs for making copies, Defendant asserts that Plaintiff's reproduction of 319,263 pages at ten-cents per page for a total cost of $31,926.30 is excessive. (Docket Entry No. 438, at 12). In its itemization list, Plaintiff asserts that copies were reasonable at approximately $0.10 per page and that color copies were slightly higher per page at $1.50 on average. (Docket Entry No. 412-12, at 7-8).

"[C]ourts should not simply 'rubber stamp' a party's photocopying expenses without examining the costs for reasonableness." *Huntsville Golf Dev., Inc. v. Brindley Const. Co.*, No. 1-08-00006, 2011 WL 4960421, at *5 (M.D. Tenn. Oct. 18, 2011) (citing *Bowling v. Pfizer, Inc.*, 132 F.3d 1147, 1151 (6th Cir.1998)). "Photocopying and printing costs are subject to greater scrutiny than other costs." *Aubin Industries, Inc. v. Smith*, No. 1:04-cv-681, 2009 WL 1674845, at *6 (S.D. Ohio June 15, 2009). "'Copying costs are generally limited to those costs incurred for copies of documents prepared for the court's consideration or for the opposing party.'" *Howe v. City of Akron*, No. 5:06-CV-2779, 2016 WL 916701, at *21 (N.D. Ohio Mar. 10, 2016), *aff'd*, 705 F. App'x 376 (6th Cir. 2017) (citations omitted). "Recoverable costs include 'costs for photocopying documents necessary for maintenance of the action, including copies attributable to discovery, copies of pleadings, correspondence, documents tendered to the opposing party, copies of exhibits, and

documents prepared for the court's consideration.'" *Charboneau v. Severn Trent Labs., Inc.*, No. 5:04-CV-116, 2006 WL 897131, at *1 (W.D. Mich. Apr. 6, 2006) (citations omitted). "Copies obtained only for the convenience of counsel, including extra copies of filed papers and correspondence, are ordinarily not recoverable." *Id.*; *Szeinbach v. Ohio State Univ.*, No. 2:08-CV-822, 2017 WL 2821706, at *16 (S.D. Ohio June 30, 2017). "The party seeking reimbursement for copying costs bears the burden of coming forward with documentation that shows that the costs were necessarily incurred for use in the case." *Howe*, 2016 WL 916701, at *21. "The description of those costs need not be 'so detailed as to make it impossible economically to recover photocopying costs,' but it must be 'the best break down obtainable from retained records.'" *Vistein v. Am. Registry of Radiologic Technologists*, No. 1:05CV2441, 2010 WL 918081, at *8 (N.D. Ohio Mar. 10, 2010) (citations omitted).

Plaintiff has submitted affidavits that the costs incurred for copies throughout thirteen years of litigation were reasonable and necessary. Plaintiff's invoices provide dates that photocopies were made and the amounts associated with the copies. Also, $0.10 per page is a reasonable rate charged. *See Moore v. Weinstein*, 40 F. Supp.3d, 945, 950-51 (M.D. Tenn. 2014). However, the invoices provided do not provide detailed information in which the Court could determine how many copies may have been made for the convenience of Plaintiff's counsel, as opposed to for the opposing party and for the Court's consideration. Yet, the record in this action easily supports the conclusion that Plaintiff's incurred a significant amount of copying costs. Thus, based on the foregoing, the Court concludes that Plaintiff's request for its copy costs should be reduced by 20%, resulting in an award of $25,541.04 ($31,926.30 - $6385.26). *Howe*, 2016 WL 916701, at *21 ("Plaintiffs total copying

expenses do not seem entirely disproportionate to the number of years this action has been pending. Nonetheless, a reduction is necessary to account for non-reimbursable copies.").

Thus, the Court will award Plaintiff a total amount of $929,629.46 (($922,784.72 - $6385.26) + $13,230.00 in expert costs incurred since March 2018) in non-taxable costs.

## F. POST-JUDGMENT INTEREST

Plaintiff seeks post-judgment interest on its attorneys' fees claim, calculated from September 29, 2016, the date the Court entered its judgment in this action. (Docket Entry No. 429, at 14). Defendant objects, contending that the Court did not award attorneys' fees in its September 29, 2016 Judgment, and absent entry of a judgment awarding attorneys' fees, there can be no post-judgment interest on Plaintiff's attorneys' fees claim that dates back to September 29, 2016. (Docket Entry No. 447, at 19).

Post-judgment interest on all judgments entered in federal courts is determined in accordance with 28 U.S.C. § 1961. *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002). Section 1961 mandates that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "[s]uch interest shall be calculated from the date of the entry of the judgment," and "shall be computed daily to the date of payment." 28 U.S.C. § 1961(a), (b). In the Sixth Circuit, § 1961's requirement "applies to attorney fees and costs as well as damages." *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 339 F. Supp. 3d 672, 689 (N.D. Ohio 2018) (citing *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 485, 490 (6th Cir. 2001)). The date for the accrual of post-judgment interest is the date of the judgment in which damages have been ascertained in a meaningful way. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990); *see Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 954 F.2d 1263, 1274-75 (6th Cir. 1992)

(finding post-judgment interest accrued on initial judgment because the original award was not vacated on appeal, even though it was later reduced by court-ordered remittitur, as damages were "sufficiently ascertained" from the original judgment). In *Drabik*, the Sixth Circuit explained that "meaningfully ascertained" does not mean "a sum certain in the context of an award of attorney fees" and that § 1961 does not require "that an award of attorney fees as part of a final judgment on the merits must first be quantified prior to accruing interest." 250 F.3d at 491.

Here, the Court did not mention attorneys' fees in its September 29, 2016 Judgment in favor of Plaintiff on the merits.[10] However, as Plaintiff won on the merits, it was a prevailing party at the time of judgment. According to the terms of the lease, "the prevailing party *shall* be entitled to recover all reasonable costs incurred, including, without limitation, reasonable attorneys' fees." (Docket Entry No. 179-3, at 14) (emphasis added). Thus, reasonable attorneys' fees were "sufficiently ascertained" at the time of the judgment, as the terms of the lease mandated that Plaintiff, as the prevailing party, was entitled to reasonable costs and attorneys' fees. *Drabik*, 250 F.3d at 491; *see U.S. ex rel. Lefan v. Gen. Elec. Co.*, 397 F. App'x 144, 152 (6th Cir. 2010) (relators were unconditionally entitled to attorneys' fees upon the court's consent to a partial settlement agreement in light of the False Claims Act's mandatory fee-shifting provision, and, thus, interest was ordered to be calculated from the time of settlement, not from when the district court entered its order awarding attorneys' fees); *Mock v. Bell Helicopter Textron, Inc.*, 456 F. App'x 799, 803 (11th Cir. 2012) (awarding interest on attorneys' fees from the date of the final judgment on the merits that did not include fees) (citing *Drabik*, 250 F.3d at 495)); *Lankford v. Reladyne, LLC*, No.

---

[10]The final pretrial order provided, "Both parties have reserved the right to pursue recovery of reasonable litigation costs, including attorneys' fees, against the other after trial following a determination of which is the 'prevailing party.'" (Docket Entry No. 366, at 7).

1:14-CV-682, 2016 WL 3640691, at *8 (S.D. Ohio June 29, 2016) (finding that plaintiff was entitled to interest on attorney fees from date of judgment, which was the date plaintiff became unconditionally entitled to such fees as a prevailing plaintiff who was statutorily entitled to reasonable attorney's fees as a prevailing plaintiff under the FMLA); *but see Pennington v. W. Atlas, Inc.*, 55 F. App'x 252, 254 (6th Cir. 2003) (after noting that an ERISA judgment did not automatically entitle a prevailing party to attorneys' fees as such fees were discretionary under 29 U.S.C. § 1132(g)(1), the Court determined that interest would not be awarded on an award of attorneys' fees from the date of judgment because the underlying original judgment did not specifically provide for an award of attorneys' fees).

Defendant contends that to recover post-judgment interest, a judgment for attorneys' fees must have been entered, but the Court did not include an award of attorneys' fees in its September 29, 2016 Judgment, citing *Jane L., et al. v. Bangerter, et al.*, 920 F. Supp. 1202, 1206 (C.D. Utah 1992) (citing *MidAmerica Federal Savings & Loan Assoc. v. Shearson/American Express, Inc.*, 962 F.2d 1470, 1475 (10th Cir. 1992)). (Docket Entry No. 447, at 19). First, the Sixth Circuit has rejected the approaches taken by the Third and Tenth Circuits in analyzing § 1961, *Dabrik*, 250 F.3d at 487-92, and thus, Defendant's reliance on a Tenth Circuit case is misplaced. Second, as stated previously, Plaintiff was a prevailing party at the time of judgment and was therefore entitled to attorneys' fees as mandated by the terms of the lease. Third, in *Dabrik*, the Court stated that it has "refused to narrowly construe [§ 1961], but rather ha[s] resolved interpretation issues with due regard to equitable considerations where relevant." *Id.* at 491. This Court notes that, in its motion to stay resolution of Plaintiff's motion for attorneys' fees and costs pending appeal, Defendant asserted that Plaintiff would not suffer any damage from a stay because if Plaintiff prevailed on

appeal, "it may account for the delay in award of its costs, fees, and expenses by requesting interest thereon[.]" (Docket Entry No. 417, at 12). As the Sixth Circuit explained, "If interest does not accrue from the time a party becomes entitled to such fees, the losing party has every reason to delay quantification of the fees. That rule provides the losing party with incentive to repeatedly request extensions, or seek a stay on the issue of attorney fees pending the merits appeal . . . . The prevailing party (or perhaps her attorney) will then be out of pocket for what is potentially a long period of time while awaiting quantification." *Drabik*, 250 F.3d at 494-95.

Accordingly, for all of the reasons stated above, the Court concludes that Plaintiff is entitled to post-judgment interest on its attorneys' fees and costs running from September 29, 2016, the date it became entitled to such fees and costs, until paid in full.

### G. INTEREST RATE

"'In diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest.'" *Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005) (citation omitted). Section 1961 provides that " interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." However, "parties may contract around § 1961 and agree to a different postjudgment interest rate." *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 753 F. Supp. 2d 665, 669 (E.D. Ky. 2010), *aff'd*, 487 F. App'x 246 (6th Cir. 2012). Yet, § 1961 "applies unless the contract includes 'language expressing an intent that a particular interest rate apply to judgments or judgment debts' that is 'clear, unambiguous[,] and unequivocal.'" *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. App'x 246, 260 (6th Cir. 2012) (citation omitted).

Here, the lease provides, in part,: "49. <u>INTEREST RATE</u>. Interest accruing pursuant to the terms of this Lease shall accrue at the lesser of : (i) Prime Rate (as hereinafter defined) plus five percent (5%) per anum, or (ii) the highest rate permitted by law (herein, such rate is referred to as the "Interest Rate.") . . . ." (Docket Entry No. 179-3, at 15). The language in the lease does not use clear, unambiguous and unequivocal language to establish the parties' intent for the interest rate to apply post-judgment. Accordingly, the Court concludes that Plaintiff is entitled to post-judgment interest at the statutory rate specified in 28 U.S.C. §1961 on its attorneys' fees and costs running from September 29, 2016, the date it became entitled to such fees and costs, until paid in full. *See Bay Venture Elyria, LLC v. Advanced Plastics Reclaiming, LLC*, No. 1:12-CV-2866, 2014 WL 4472620, at *6 (N.D. Ohio Sept. 11, 2014) (finding that the note made no reference to judgments and could not, "therefore, be construed as an unequivocal agreement that such a rate would apply to judgments," the court concluded "that the parties did not, by agreement, contract around the statutory interest rates in § 1961.") (citing *Huntsville Golf Dev., Inc.*, 2011 WL 4960421, at * 17).

## H. BILL OF COSTS

Plaintiff submitted a bill of costs (Docket Entry No. 416) in the amount of $24,904.80 to which Defendant has not responded or addressed in any of its responses (Docket Entry Nos. 438 and 447). Accordingly, Plaintiff's bill of costs is granted in the amount requested.

## III. CONCLUSION

Accordingly, for these reasons, the Court concludes that Plaintiff's bill of costs (Docket Entry No. 416) in the amount of $24,904.80 be granted and that Plaintiff's motion for attorneys' fees (Docket Entry No. 411) be granted in part and denied in part and Plaintiff should therefore recover a total award of attorneys' fees in the amount of $1,775,245.17, and costs in the amount of

$929,629.46 ($916,399.46 allowed for initial request for costs, plus $13,230.00 in expert costs incurred since March 2018). Plaintiff is also entitled to post-judgment interest at the statutory rate specified in 28 U.S.C. §1961 on its attorneys' fees and costs running from September 29, 2016, the date it became entitled to such fees and costs, until paid in full. Defendant's motion to stay resolution of Plaintiff's motion for attorneys' fees and costs pending appeal (Docket Entry No. 417) is denied as moot.

An appropriate Order shall be entered.

JEFFERY S. FRENSLEY
United States Magistrate Judge